OPINION
WRIGHT, Justice.
This appeal requires us to interpret an exception to the general rule that an employee injured in the course of employment is entitled to workers’ compensation benefits. Specifically, an employer is not liable for injuries incurred by an employee while participating in an employer-sponsored “voluntary recreational program[ ],” MinmStat. § 176.021, subd. 9 (2014). The Workers’ Compensation Court of Appeals (WCCA) concluded that an employee-recognition event sponsored by relator was not “voluntary” because attendance at the event was the only option by which respondent could avoid a loss of pay or benefits. We conclude that an employer-sponsored recreational program is not “voluntary” when it takes place during work hours and employees must either attend the event or use limited vacation time in order to get paid. We further conclude that individual activities that take place during a voluntary recreational program do not constitute separate “programs.” We, therefore, affirm.
I.
Respondent Ali Shire worked the Friday-through-Sunday weekend shift as a full-time, permanent employee in the shipping department of relator Rosemount, Inc. During the last three hours of a weekend shift in October 2012, Rosemount sponsored its annual employee-recognition event, which was held specifically for the weekend-shift employees of the shipping department. Rosemount’s online employee handbook states that “recognition events are voluntary in purpose and all employees have the choice to decide to participate.... If an invitation or sign-up sheet is utilized, it should very clearly state the event is voluntary.” . The handbook does not provide , any information about an employee’s pay or the use of vacation or unpaid leave during a recognition event.
The compensation judge found, and it is undisputed on appeal, that the weekend-shift employees had three options with respect to the October 2012 recognition event: attend the recognition event and receive their usual wage for the last three hours of the shift, request tó use their accrued paid vacation time, or request to take unpaid leave.[1] Rosemount’s policy is *291 to limit the total number of employees in a department who are permitted to take vacation or unpaid leave at the same time to no more than 10 percent.
The employee-recognition event consisted of dinner followed by bowling, then a game of laser tag. Shire injured his right ankle while playing laser tag. As a result of his injury, Shire was temporarily and totally disabled from performing his normal job duties for more than one year. He also sustained a 3.98 percent permanent partial disability of the whole body. Shire filed a petition for workers’ compensation benefits. Rosemount denied liability, asserting that Shire’s injury is excluded from coveragé under Minn.Stat. § 176.021, subd. 9. Subdivision 9 exempts injuries incurred during “voluntary recreational programs” from workers’ Compensation coverage. Id.
Rosemount advanced two arguments before the compensation judge. First, Rose-mount argued that the employee-recognition event was a “voluntary recreational program” because Rosemount provided its employees with alternatives to attendance at the event — the options of requesting to use vacation time or requesting to take unpaid leave. Second, even if the employee-recognition event was not “voluntary,” Rosemount argued that Shire’s' injury falls within the voluntary-recreational-program exception because, he was injured while participating in a voluntary game at the employee-recognition event.
In response to Rosemount’s first argument, Shire countered that the event was not “voluntary” because it occurred during his shift and he was required to attend in order to obtain his wage without sacrificing his limited vacation time. Shire also argued that he could not take vacation or unpaid leave without his supervisor’s prior approval. In response to Rosemount’s second argument, Shire contended that the statute addresses the voluntary nature of the employee-recognition program, not the voluntary nature of the laser-tag game.
. The compensation judge held that "the relevant question is whether the “program” was voluntary, not whether the activities within the program were voluntary. The employee-recognition event was not a “voluntary” program, . the compensation judge, concluded, because without the option of remaining at work for the last three hours, of his shift, Shire’s only alternatives were to sacrifice either his pay or his limited vacation time. The WCCA affirmed. Shire v. Rosemount, Inc., 2015 WL 2327967 (Minn. WCCA Apr. 22, 2015). Rosemount now seeks review by this court.
II.
Generally, an employee whose injury “aris[es] out of and in the course of employment” is entitled to workers’ compensation benefits. Minn.Stat. § 176.021, subd. 1 (2014). The Legislature created an exception, however, for injuries incurred while participating in employer-sponsored “voluntary recreational programs.” Id., subd. 9. The exception provides:
Injuries incurred while participating in voluntary .recreational programs sponsored by the employer, including health promotion programs, athletic events, parties, and picnics, do not arise out of and in the course of the employment even though the employer pays some or all of the cost of the program. This exclusion does not apply in the event that the injured employee was ordered *292 or assigned by the employer to participate.in the program.
Id. (emphasis added),
At issue here is the meaning of the phrase “voluntary recreational program” in subdivision 9, a question of statutory interpretation, which we review de novo. Dykhoff v. Xcel Energy, 840 N.W.2d 821, 825-26 (Minn.2013). The purpose of statutory interpretation is to ascertain the intention of the Legislature. Ekdahl v. Indep. Sch. Dist. No. 213, 851 N.W.2d 874, 876 (Minn.2014). We interpret words employed in a statute according to their plain meaning. Schatz v. Interfaith Care Ctr., 811 N.W.2d 643, 649 (Minn.2012). To determine the plain meaning of a word, we often consider dictionary definitions. See Troyer v. Vertlu Mgmt. Co./Kok & Lundberg Funeral Homes, 806 N.W.2d 17, 24 (Minn.2011).
We also interpret statutes so as to give effect to each word and phrase. Allan v. R.D. Offutt Co., 869 N.W.2d 31, 33 (Minn.2015) (stating that statutes should be interpreted such that “no word, phrase, or sentence [is] superfluous, voicf, or insignificant”) (quoting Am. Family Ins. Grp. v. Schroedl, 616 N.W.2d 273, 277 (Minn.2000)); accord Minn.Stat. § 645.16 (2014). When a word or phrase has a plain meaning, we presume that the plain meaning is consistent with legislative intent and engage in no further statutory construction. State v. Struzyk, 869 N.W.2d 280, 284-85 (Minn.2015); see also Allan, 869 N.W.2d at 33 (“When the language of a statute is plain'and unambiguous, it is assumed‘to manifest legislative intent and must be given effect.”) (quoting Burkstrand v. Burkstrand, 632 N.W.2d 206, 210 (Minn.2001)).
A.
Rosemount’s principal argument is that the employee-recognition event was “voluntary” because employees had the option of either requesting to use vacation time or requesting to take unpaid leave. Shire contends that he was implicitly compelled to attend the event because attendance was the only option by which he. could get paid without using his limited vacation time.
1.
Because the workers’ compensation statute does not define the word “voluntary,” we begin our plain-meaning analysis with dictionary definitions. " According to these definitions, an option is “voluntary” when it is “[d]one or undertaken of one’s own free will” or “done willingly and without constraint or expectation of reward.” The American Heritage Dictionary of the English Language 1941-42 (5th ed.2011); see also Webster’s Third New International Dictionary Unabridged 2564 (3d ed.2002) (defining “voluntary” as “proceeding from the will: produced in or by an act of choice”; “performed, made, or given of one’s own free will”; or “acting of oneself: not constrained, impelled, or influenced by another”).
Contrary to these definitions, employees were “constrained” by the fact that attendance at the employee-recognition eVent was the only means by which they could obtain their wages without expending limited vacation time. To hold that a program is “voluntary” under these circumstances would ignore the financial consequences that employees would have faced for failing, to attend: either the loss of pay or the depletion of limited vacation time.
Moreover, concluding that a program is “voluntary” under these facts would violate the canon against surplusage, which ré-quires us to give effect to each word and phrase of a statute. Allan, 869 N.W.2d at 33. Rosemount argues that a program *293 may be involuntary when vacation and unpaid leave are unavailable during the program. But in that situation the employee has been “ordered or assigned” to attend. See Minn.Stat. § 176.021, subd. 9 (“This exclusion does not apply in the event that the injured employee was ordered or assigned by the employer to participate in the program.” (emphasis added)). If “voluntary” means the opposite of “ordered or assigned,” then the word “voluntary” could be eliminated from subdivision 9 without altering the effect of subdivision 9.[2] Interpreting subdivision 9 in a manner that gives the word “voluntary”' no meaning would effectively foreclose the possibility that a program would evér be found involuntary.
Rosemount also contends that it communicated to employees,- both through, the employee handbook and orally at staff meetings, that the event was “voluntary” and that employees should speak with their supervisor if they did not wish to attend. But an analysis based solely on an employer’s conclusory statements that programs are “voluntary,” even when compensation or vacation benefits must be forfeited in order to opt out of attendance, fails to account for the economic bargain struck between employer and employee. Indeed, every employer could adopt an employee-handbook provision that deems such programs “voluntary” and thus claim the exception in subdivision' 9 to shield the employer from workers’ compensation liability. Yet, as happened here, the employer could impose consequences on an employee’s failure to attend an event that the handbook describes as “voluntary.” An employer’s classification of an event as “voluntary” should not prevail.when the facts.demonstrate that employees had only one “choice,” namely, to attend.
Similarly, Rosemourit’s contention that Shire never requested time off is irrelevant. Even if Shire had been granted time off, he would have incurred financial consequences: either the loss of his pay or the loss of his limited vacation, time. Effectively, Shire’s decision to attend Rose-mounds event, under the conditions Rose-mount imposed, was; “constrained” by his need to earn, money — -the,very purpose of employment. Under these circumstances, Rosemount’s - employee-recognition event was not “voluntary,”-. , , ,
Finally, Rosemount argues that our interpretation of subdivision 9 effectively éliminates the voluntary-recreational-program exception because some[1] erriployers are logistically unable to offer their employees the option of staying at work during a recreational program. We are not persuaded that subdivision 9 will never be given effect as a consequence of our disposition in this case.'" In fact, the WCCA has considered at least two cases in which employers provided the option of staying at work during recreational programs. See, e.g., Paskett v, Imation Corp., 2013 WL 398699, at *2 (Minn. WCCA Jan. 3, 2013); Éllingson v. Brady Corp., 66 Minn. Workers’ Comp. Dec. 27, 29 (WCCA), aff'd without opinion, 707 N.W.2d 676 (Minn.2006). Thus, it is clear that at least some employers are logistically able to provide this option.[3]
*294 Here, Rosemount could' have paid all weekend-shift employees for the last three hours of the shift regardless of their attendance at -the recognition event. Conversely, Rosemount could have paid none of the employees for the three hours ‘at issue.' In either circumstance, no implicit coercion would exist. Rosemount argues that paying all' employees would be unworkable because Rosemount withheld pay for those'who did not attend in order to encourage attendance. Rosemount’s argument simply'reinforces our conclusion that employees were implicitly coerced to attend the event in order to receive their pay and avoid depletion of their vacation benefits. Moreover, attendance by every employee is not essential to the success of a recreational program. If the Legislature intended to encourage employers to host recreational programs for the benefit of employees, as Rosemount speculates, logic and reality dictate that employers should sponsor such programs to provide an opportunity for employees, not a mandate.
To summarize, a recreational program is not “voluntary” when the employees’ options are limited either to (1) attending the program and getting paid or (2) forfeiting pay or benefits. To conclude otherwise fails to preserve the plain words of the statute and renders the word “voluntary” in Minn.Stat. § 176.021, subd. 9, meaningless.'
2.
The dissent would hold that Rose-mount’s employee-recognition event was “voluntary” 'for two reasons. First, the dissent argues, the relevant definition of a word “depends on the context in which [it] is used.” Yet, the dissent ignores the context in which the word “voluntary” is used in Minn.Stat. § 176.021, subd. 9. Next, the dissent relies on criminal cases to support its interpretation of the word “voluntary.”
We do not dispute the principle that we consider the context of a statute. The dissent cites State v. Nelson, in which we applied the canon against surplusage, 842 N.W.2d 433, 437-39 (Minn.2014). Indeed, we apply 'the canon against surplusage in this case by considering the meaning of the word “voluntary” in the context of the exception for employees' who are “ordered or assigned” to attend a program. In contrast, the dissent fails to apply the principle expressed in Nelson,[4]
*295 Nor do we disagree with the dissent’s proposed definition of a “voluntary recreational program” as “one that is attended without coercion by the employer and by an employee’s act of choice among reasonable alternatives.” But the dissent does not explain how forfeiting pay or benefits is a “reasonable alternative” to attending an employer-sponsored program. For employees who rely on their wages to earn a living, forfeiting pay and benefits is not a reasonable option.
Rather than considering the context of the workers’ compensation statute, the dissent turns to criminal cases to support its narrow interpretation of the term “voluntary.” [5] To justify this approach, the dissent cites inapposite case law. Two of the opinions relied on by the dissent cited dictionary definitions. 500, LLC v. City of Minneapolis, 837 N.W.2d 287, 290-91 (Minn.2013) (citing case law and dictionary definitions of the phrase “relating to”); State v. Campbell, 814 N.W.2d 1, 8 (Minn.2012) (Stras, J., dissenting) (relying on dictionary definitions but observing that our case law had reached the same result). In the other instances cited by the dissent, we applied the technical, legal definition of a word, not the plain meaning. 500, LLC, 837 N.W.2d at 291 (employing the technical meaning of the word “zoning”); Odunlade v. City of Minneapolis, 823 N.W.2d 638, 644 (Minn.2012) .(observing in dicta that “assessment,” a technical, legal term, had been defined.-broadly in other tax cases); see also In re Welfare of J.J.P., 831 N.W.2d 260, 266 (Minn.2013) (stating that we interpret technical words according to their specialized meaning). And in not one of these cases did we reach into other areas of substantive law to determine the correct meaning of a word.
Nothing in our case law dictates that we import definitions from vastly different areas of substantive law into a completely unrelated context, and we decline to create such precedent here. Rather, we rely on the text of. Minn.S'tat. § 176.021, subd. 9, and hold that Rosemount’s employee-recognition event was not “voluntary.”
B.
Having decided that the employee-recognition event was not “voluntary,” we next consider Rosemount’s alternative argument. Rosemount contends that, even if the recognition event was not voluntary, Shire’s participation in the laser-tag game at the event was voluntary. Subdivision 9 lists “health promotion programs, athletic events,, parties, and picnics” as examples of recreational programs. , Minn.Stat. § 176.021, subd. 9. Rosemount argues that the inclusion of the term “athletic events” in subdivision 9 demonstrates legislative intent to focus on the voluntariness of a single athletic activity, such as a laser-tag game, rather than the voluntariness of an entire prpgram.
Rosemount’s argument invites us to define the word “program” on an activity-by-activity basis.[6] We are not persuaded. *296 Subdivision 9- plainly applies to injuries incurred “while participating in [a] voluntary ... program, [ ].” Minn,Stat. § 176.021, subd, 9 (emphasis added).- We interpret statutes according to the rules of grammar. Ekdahl, 851 N.W.2d at 876 (citing Minn-Stat. § 645.08(1) (2014)). In subdivision 9, the word “voluntary” is an adjective that modifies the noun “program.” See The Chicago Manual of Style 5.78 (16th ed.2010). The plain meaning of “program” in subdivision .9 is a. collection of activities. Random, House Webster’s Unabridged Dictionary 1546 (2d ed.2001) (defining “program” as “a plan or schedule of activities, procedures, etc., to be followed”); see also The American Heritage Dictionary'at 1407 (defining “program” as “[a]n ordered list of events to take place or procedures to be followed; a schédule”). When read as a whole, subdivisioh 9' requires that the program, be voluntary, not the individual 'activities offered within the program.' The placement of the word “participation” in relation to the word “voluntary”' in subdivision 9 makes this clear. The Legislature did not create an exception for “injuries incurred while voluntarily participating in a recreational program.” Rather, the Legislature created an exception for “[injuries incurred while participating in [a] voluntary recreational program[ ].” Minn.Stat. § 176.021, subd. 9. Thus, the voluntariness of an employee’s participation in an individual activity does not govern the application of subdivision 9.
Rosemount’s reading of subdivision 9 defies this plain meaning. Nothing in the plain language of subdivision 9 dictates an activity-by-activity analysis. “[Ajthletic events, parties, and pienics,” id., often consist of multiple activities.[7] We decline to adopt an interpretation of the word “program” that is contrary to the word’s plain, ordinary meaning. Accordingly, we hold that the phrase “voluntary recreational program” in Minn.Stat. § 176.021, subd. 9, plainly refers to a voluntary “program,” not voluntary activities within a program.
IIL
To summarize,. we, hold that a recreational program is not “voluntary” when -.the employees’ choices are either to attend the program or risk forfeiting pay or benefits. We further hold that the relevant inquiry when applying Minn.Stat. § 176.021, subd. 9, is whether the program is voluntary, not whether individual recreational activities within the program are voluntary. Accordingly, we affirm.
Affirmed.
Dissenting, ANDERSON, J.

. Under Rosemount’s interpretation, the statute would read:
Injuries incurred while participating in ... recreational programs ... do not arise out of and in the course of the employment.... This exclusion does not apply in the event that the injured employee was ordered or assigned by the employer to participate in the program.
See Minn.Stat, § 176.021, subd. 9.

. The dissent argues that our holding conflicts with Ellingson and Paskett, as well as Sager v. City of Roseville, 52 Minn. Workers’ Comp. Dec. 281 (WCCA), aff'd without opinion, 529 *294 N.W.2d 701 (Minn.1995). We are not bound by WCCA decisions. Moreover, Ellingson, Paskett, and Sager are not before, us today, and we decline to address whether the WCCA employed the proper analyses in those cases. However, it is noteworthy that, in deciding the present case, the WCCA distinguished Ellingson and Paskett. Shire, 2015 WL 2327967, at *5.As addressed above, employees had the option of remaining at work in both cases. Unlike the Rosemount employees, the Elling-son and Paskett employees were not compelled to attend the recreational programs at issue in order to get paid. The WCCA found this distinction critical. Id. ("[I]n both Ell-ingson and Paskett, one of the options offered Was that the employee might simply continue to perform his usual job, without loss of pay or benefits. We agree with the compensation judge that this distinction is a critical one in cases where' the program is scheduled during an employee's normal working hours.”). Similarly, in Sager, there is no indication that employees were required to attend the program at issue in order to receive their wages, See 52 Minn. Workers’ Comp. Dec. at 281-82.

. The dissent also contends that a dictionary’s first-listed- definition of a word expresses the . word's most common meaning. Yet, the dissent maintains that we should choose the relevant definition based on the context in which the word is used.' The definitions we rely on are well-suited to the context of Minn. Stat. § 176.021, subd. 9, particularly because, in order to avoid surplusage, we must define "voluntary” as distinct from the phrase "ordered or assigned.”

. Significantly, the criminal cases cited by the dissent involving voluntary confessions and voluntary guilty pleas' do not employ the rules of statutory interpretation, See, e.g., State v. Riley, 568 N.W.2d 518, 525 (Minn.1997) (analyzing the voluntariness of a confession as required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution); State v. Ecker, 524 N.W.2d 712, 718-19 (Minn.1994) (discussing case law on voluntary guilty pleas).

. Rosemount proposed a different theory .at oral argument. According to Rosemount, the "program” could be alternatively (1) Rose-mount’s overall employee wellness program, (2) the employee-recognition event, or (3) the laser-tag game at the event. We need not address this theory because it was raised for the first time at oral argument. See City of Duluth v. Cerveny, 218 Minn. 511, 524, 16 N.W.2d 779, 786 (1944) (citing Cutting v. *296 Weber, 77 Minn. 53, 54, 79 N.W. 595, 595-96 (1899)).

. For example, there may be a volleyball game at a company picnic. Similarly, an athletic event may consist of multiple games. Yet, a single football game would constitute a "program” when the game is the solé recreational activity.

, Depending on the dictionary publisher, the first-listed meaning is the “most commonly sought meaning,” the “most established ,.. literal and central” meaning, or the historical first-known meaning, See The American Heritage Dictionary of the English Language, at *298 xxiv (5th ed, 2011) (“Entries containing more than one sense are arranged for the convenience of the reader with the central and often the most commonly sought meaning [appearing] first.”); New Oxford American Dictionary, at xv (3d ed. 2010) (‘‘[T]he first definition given ,is the core sense_ Core meanings represent typical, central, uses_ It is the meaning accepted by native speakers as the one that is most established as literal and central.”); Webster's Third New International Dictionary Unabridged l’7a (3d ed. 2002) (“The order of senses is historical; the one known to have been first used in English is entered first.").